UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| VIKRAM VARMA, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 19-cv-7153 |
| | ) | |
| v. | ) | Hon. Steven C. Seeger |
| | ) | |
| TCC WIRELESS, LCC and | ) | |
| FRANK BAREE, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**MEMORANDUM OPINION AND ORDER**

An employee is hired, and later quits. Then he is re-hired, and later fired. Does a contract signed at the outset of the first employment period govern claims arising under the second? Under the plain language of the contract, the answer is no. Defendants' motion to compel arbitration is therefore denied.

**Background**

Plaintiff Vikram Varma is a former employee of Defendant TCC Wireless, LLC ("TCC"), a company that provides wireless phone services as a franchisee of T-Mobile. *See* First Am. Cplt. ¶ 6 (Dckt. No. 20).[1] Varma worked for TCC twice.

TCC first hired Varma in May 2016. *Id.* at ¶ 8. At that time, Varma signed an employee agreement that included an arbitration provision (the "Employment Agreement"). *See* Employment Agreement (Dckt. No. 11-1). Varma worked as a Retail Store Manager and Retail Training Manager for more than a year, from May 2016 to September 2017. *See* First Am. Cplt.

---

[1] The Court cites to the First Amended Complaint, even though it was filed after Defendants moved to compel arbitration and completed briefing on the motion. In the most recent joint status report, the parties gave no reason (and the Court sees none) why the amended complaint would alter the arguments on the motion, and instead reported that they "are awaiting ruling on this Motion." *See* Dckt. No. 26, at 2.

¶ 8; *see also* Pl.'s Resp., at 2 (Dckt. No. 14). In September 2017, Varma left TCC "for other opportunities," including working for Target. *See* First Am. Cplt. ¶ 8; Pl.'s Resp., at 2. At that point, the employment relationship ended.

Varma's absence didn't last long. The CEO of TCC, Jay Malik, reached out to Varma in October, scheduled a meeting, and told Varma that "he would be a great fit for a soon-to-be available role of Director of Operations." *See* First Am. Cplt. ¶¶ 9–10. The prospect of a promotion (and a raise) enticed Varma back. He rejoined TCC in late October 2017 as a Retail Auditor, with the expectation that TCC would promote him to Director of Operations (with a higher salary) by February 2018. *Id.* at ¶ 11.

When he was rehired, Varma signed an offer letter that expressly required him to sign other new hire paperwork. *See* 2017 Offer Letter, at 1 (Dckt. No. 14, at 10 of 11). "This offer is contingent upon your signing all necessary new hire paperwork and agreements." *Id.* But there is no indication that Varma signed another employee agreement, or a standalone arbitration agreement.

Varma's troubles at TCC started shortly after he rejoined the company. TCC didn't groom and ultimately elevate Varma for the Director of Operations role, as the company allegedly promised. *See* First Am. Cplt. ¶ 13. Instead, TCC put Varma under the supervision of Defendant Frank Baree, who, to Varma's surprise, held the Director of Operations title that the CEO had promised to Varma. *Id.* at ¶ 15. Instead of promoting Varma, they de facto demoted him. Baree assigned Varma jobs that had nothing to do with the Retail Auditor role. *Id.* at ¶ 12. Instead of handling "inventory and brand management," Varma performed menial tasks like "cleaning [stores], rewiring demos and organizing the backroom," *id.* at ¶¶ 13, 45, 55, 68, transporting equipment between stores, *id.* at ¶ 63, cleaning out a dirty company van, *id.* at ¶ 66,

running "personal errands" for Baree, *id.* at ¶ 38, and photographing a company event, *id.* at ¶¶ 39–40.

To make matters worse, Varma allegedly suffered mistreatment, too. Baree (who is Pakistani) frequently harassed Varma based on his Indian ethnicity and Hindu faith. *Id.* at ¶¶ 5, 16, 30. Baree made offensive comments about Varma's ethnicity. *Id.* at ¶¶ 27–30, 48–52. He denied Varma vacation time for Hindu religious holidays, even though Pakistani employees were given vacation time for Muslim holidays. *Id.* at ¶¶ 22–23. And Baree even touched Varma inappropriately during an offsite work trip. *Id.* at ¶¶ 31–32.

The mistreatment extended to medical leave. Baree allegedly retaliated against him for exercising his rights under the Family and Medical Leave Act by taking medical leave. *Id.* at ¶¶ 7, 53–66, 69–73. Indeed, Varma alleges that TCC terminated Varma for exercising his FMLA rights. *Id.* at ¶¶ 69–73.

Varma ultimately filed a six-count complaint against TCC and Baree. The complaint includes federal law claims under the FMLA (Counts I-II) and Title VII (Counts III-IV), as well as state law claims for intentional infliction of emotional distress (Count V) and invasion of privacy (Count VI).

Defendants moved under the Federal Arbitration Act to compel arbitration of all of Varma's claims and to dismiss the complaint "with prejudice" under Fed. R. Civ. P. 12(b)(1), or, in the alternative, to stay the action pending the outcome of the arbitration. *See* Mtn. to Compel Arbitration (Dckt. No. 11).

**Analysis**

**I.      Motion to Dismiss for Lack of Subject Matter Jurisdiction**

Based on the arbitration provision of the Employment Agreement, Defendants moved to dismiss the complaint with prejudice for lack of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1). *Id.* Defendants cite the wrong Rule and ask for the wrong remedy.

An agreement to arbitrate is like any other "'freely negotiated contractual choice-of-forum provision[].'" *See Jackson v. Payday Fin., LLC*, 764 F.3d 765, 773 (7th Cir. 2014) (quoting *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.*, 473 U.S. 614, 630–31 (1985)). Motions to compel arbitration "concern venue and are brought properly under Federal Rule of Civil Procedure 12(b)(3), not Rule 12(b)(1)." *See Grasty v. Colorado Tech. Univ.*, 599 F. App'x 596, 597 (7th Cir. 2015) (citing *Jackson,* 764 F.3d at 773). The presence of an arbitration agreement "does not affect a district court's subject-matter jurisdiction." *Id.* (citing *Mitsubishi Motors Corp.,* 473 U.S. at 628). A motion to compel arbitration is about the proper forum, not the power of the Court.

A dismissal for lack of subject matter jurisdiction is not a dismissal with prejudice, either. "A dismissal with prejudice is a ruling on the merits, because it carries with it a preclusive effect that prevents the plaintiffs from relitigating – in any court, ever again – any claim encompassed by the suit." *MAO-MSO Recovery II, LLC v. State Farm Mut. Auto. Ins. Co.*, 935 F.3d 573, 581 (7th Cir. 2019). "'No jurisdiction' and 'with prejudice' are mutually exclusive. A court that lacks subject matter jurisdiction cannot dismiss a case with prejudice." *Murray v. Conseco, Inc.*, 467 F.3d 602, 605 (7th Cir. 2006) (citation omitted); *Lennon v. City of Carmel, Indiana*, 865 F.3d 503, 509 (7th Cir. 2017) ("When a district court dismisses an action for lack of jurisdiction, the dismissal must be without prejudice. . . . This is because a dismissal with prejudice operates

as a disposition on the merits, which a court without the power to hear a case may not issue.") (citation omitted). A court without power is powerless to dismiss a claim with prejudice.

Rule 12(b)(1) is the wrong rule for this motion, and dismissal with prejudice is the wrong relief. The motion to dismiss for lack of subject matter jurisdiction is denied.

## II. Motion to Compel Arbitration or Stay Proceedings

The Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1–16, governs the enforcement, validity, and interpretation of arbitration clauses in employment contracts. *See Gupta v. Morgan Stanley Smith Barney, LLC*, 934 F.3d 705, 710 (7th Cir. 2019) (citing *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 118–19 (2001)). Congress enacted the FAA to counteract the common law aversion to enforcing arbitration agreements, thereby "direct[ing] courts to abandon their hostility and instead treat arbitration agreements as 'valid, irrevocable, and enforceable.'" *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1621 (2018) (quoting 9 U.S.C. § 2).

"Federal law favors arbitration." *Brickstructures, Inc. v. Coaster Dynamix, Inc.*, 952 F.3d 887, 891 (7th Cir. 2020) (citing *Epic Sys. Corp.*, 138 S. Ct. at 1621); *see also Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 443 (2006) (describing a "national policy favoring arbitration"); *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25 (1983) ("[Q]uestions of arbitrability must be addressed with a healthy regard for the federal policy favoring arbitration . . . . The [FAA] establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration.").

At the same time, "courts cannot require a party to submit a dispute to arbitration unless he has agreed to do so." *Gupta*, 934 F.3d at 710. After all, "'arbitration is a matter of contract.'" *See AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011) (citation omitted); *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 24 (1991) (noting that the FAA put "arbitration

5

agreements upon the same footing as other contracts"). The law favors arbitration when the parties have *agreed* to arbitration.

The Court starts with the presumption that "parties have not authorized arbitrators to resolve certain 'gateway' questions, such as 'whether the parties have a valid arbitration agreement at all or whether a concededly binding arbitration clause applies to a certain type of controversy.'" *Lamps Plus, Inc. v. Varela*, 139 S. Ct. 1407, 1416–17 (2019) (quoting *Green Tree Fin. Corp. v. Bazzle*, 539 U.S. 444, 452 (2003) (plurality opinion)); *Wisconsin Local Gov't Prop. Ins. Fund v. Lexington Ins. Co.*, 840 F.3d 411, 414–15 (7th Cir. 2016). District courts ordinarily decide whether there is an agreement to arbitrate. *See Bigger v. Facebook, Inc.*, 947 F.3d 1043, 1051 (7th Cir. 2020) ("[D]etermining whether a valid arbitration agreement exists is generally within the court's authority."); *Wisconsin Local Gov't Prop. Ins. Fund*, 840 F.3d at 414–15.

Defendants have not rebutted this presumption. TCC did not argue that the arbitrator must decide whether there is a valid agreement to arbitrate, or whether this controversy falls within the scope of an arbitration agreement. *See* Mtn. to Compel Arbitration (Dckt. No. 11). Indeed, TCC acknowledged that a "'district court must promptly compel arbitration *once it is satisfied that the parties agreed to arbitrate*.'" *Id.* at 4 (quoting *Tinder v. Pinkerton Sec.*, 305 F.3d 728, 735 (7th Cir. 2002)) (emphasis added). True, the arbitration clause charges the arbitrator with "interpretation of [sic] enforcement or [sic] any of the Parties' rights or obligations under this Agreement." *See* Employment Agreement, at ¶ 12 (Dckt. No. 11-1). But it does not empower the arbitrator to decide whether an agreement existed at all. So the Court decides whether the parties agreed to arbitrate this dispute.

To promote arbitration, the FAA "provides for stays of proceedings in federal district courts when an issue in the proceeding is referable to arbitration, [9 U.S.C.] § 3, and for orders compelling arbitration when one party has failed, neglected, or refused to comply with an arbitration agreement, [9 U.S.C.] § 4." *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 25 (1991). A court may compel arbitration if the movant demonstrates three elements: (1) a written agreement to arbitrate, (2) a dispute within the scope of the arbitration agreement, and (3) a refusal to arbitrate. *See Zurich Am. Ins. Co. v. Watts Indus., Inc.*, 417 F.3d 682, 687 (7th Cir. 2005).

Courts review motions to compel arbitration under a summary judgment standard. *See Tinder v. Pinkerton Sec.*, 305 F.3d 728, 735 (7th Cir. 2002). "The party opposing arbitration must identify a triable issue of fact concerning the existence of the agreement in order to obtain a trial on the merits of the contract." *Id.* The Court must accept the complaint's allegations as true, and draw "all justifiable inferences" in the non-movant's favor. *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).

### A. The Employment Agreement

The first question is whether there is a valid, written agreement to arbitrate in the first place.[2] *See Gupta*, 934 F.3d at 710. Defendants have met their initial burden to show a valid

---

[2] This Court applies "state-law principles of contract formation to answer" whether there is a valid agreement to arbitrate. *See Gupta*, 934 F.3d at 710–11 (citing *Gore v. Alltel Commc'ns, LLC*, 666 F.3d 1027, 1032 (7th Cir. 2012)). Here, the Court applies Illinois law. All of the conduct at issue occurred in Illinois. *See* First Am. Cplt. (Dckt. No. 20). The Employment Agreement provides that Illinois law "shall govern the interpretation, validity, performance, and enforcement" of the agreement. *See* Employment Agreement, at ¶ 10(h) (Dckt. No. 11-1). No party suggests that any other law applies. *See Selective Ins. Co. of S.C. v. Target Corp.*, 845 F.3d 263, 266 (7th Cir. 2016), *as amended* (Jan. 25, 2017) ("If no party raises a choice of law issue to the district court, the federal court may simply apply the forum state's substantive law.") (cleaned up); *Bowers v. Fed'n Internationale de l'Automobile*, 489 F.3d 316, 323 n.4 (7th Cir. 2007) (holding that "the parties' silence forfeits choice-of-law issues").

written agreement to arbitrate. But it did not cover his second tour of duty with the company, which is the sole focus of this lawsuit.

Varma signed the Employment Agreement when he joined TCC in May 2016. The Employment Agreement required arbitration of any dispute related to his employment:

> 12. **Arbitration**. Any dispute arising out of or relating in any [sic] to Employee's employment with the Company, including but not limited to the interpretation of [sic] enforcement or [sic] any of the Parties' rights or obligations under this Agreement, other than those seeking equitable relief, shall be resolved by binding arbitration according to the rules of the American Arbitration Association in the State listed in 10(h) above.

*See* Employment Agreement, at ¶ 12 (Dckt. No. 11-1) (bold in original).

When Varma was rehired in October 2017, he did not sign another employment agreement. He did not sign a standalone arbitration agreement, either. And he did not sign anything saying that the old Employment Agreement sprang back to life. Instead, Varma only signed an offer letter (the "2017 Offer Letter"), which did not contain an arbitration provision. *See* 2017 Offer Letter (Dckt. No. 14, at 10–11 of 11). TCC agrees that Varma did not sign a new employment agreement or a standalone arbitration agreement when he rejoined the company in 2017. *See* Defs.' Reply (Dckt. No. 17).

Varma, for his part, doesn't dispute that the Employment Agreement from 2016 contained a valid, written agreement to arbitrate. *See* Pl.'s Resp., at 2 (Dckt. No. 14). But Varma argues that the arbitration provision in the Employment Agreement only covers his first stint at TCC. *Id.* at 3–6. So the question is whether the arbitration provision in the Employment Agreement governed Varma's employment when he rejoined the company.

TCC contends that the Employment Agreement remains in effect because the company "treated" Varma as an employee. *See* Defs.' Reply, at 1–6 (Dckt. No. 17). According to TCC, Varma was always considered an employee, despite the month he spent working for Target:

8

"TCC treated Plaintiff as continuously employed" the entire time. *Id.* at 1. So, the argument goes, the Employment Agreement continued to govern until TCC fired Varma in May 2019.

It is unclear what, exactly, TCC means that it "treated" Varma as "continuously employed." *Id.* In the same breath, TCC admits that "it is true that Plaintiff left his employment with TCC in late September 2017 and returned on October 27, 2017." *Id.* Maybe TCC means that it thought of him as a favored son and part of the corporate family, even though he no longer worked there.

Whether TCC "treated" Varma as continuously employed from 2016 to 2019 – that is, whether, in its corporate heart of hearts, TCC considered Varma an employee throughout the period – is beside the point. First, under the FAA, agreements to arbitrate must be written down. *See* 9 U.S.C. §§ 3, 4. And second, "the parties' subjective intentions are irrelevant" when deciding whether there is mutual assent to a contract. *See Nat'l Prod. Workers Union Ins. Trust v. Cigna Corp.*, 665 F.3d 897, 901 (7th Cir. 2011). "Secret hopes and wishes count for nothing because the status of a document as a contract depends on what the parties express to each other and to the world, not on what they keep to themselves." *Laserage Tech. Corp. v. Laserage Labs., Inc.*, 972 F.2d 799, 802 (7th Cir. 1992) (cleaned up). Mutual assent depends on "objective" evidence at the time of contract formation. *Id.*

The four corners of the Employment Agreement control whether Varma remained bound by the arbitration provision after leaving the company. Based on the plain language, the Employment Agreement governed the term of his employment, meaning May 2016 to September 2017, and no more.

The arbitration provision in the Employment Agreement mandates arbitration of "[a]ny dispute arising out of or relating in any [way] to Employee's employment with the Company."

*See* Employment Agreement, at ¶ 12 (Dckt. No. 11-1). In isolation, the language appears broad. It covers disputes about his "employment." *Id.*

But the Court must interpret the words in the arbitration provision in the context of the agreement as a whole. *See Sevugan v. Direct Energy Servs., LLC*, 931 F.3d 610, 618 (7th Cir. 2019) ("[B]ecause words derive their meaning from the context in which they are used, a contract must be construed as a whole, viewing each part in light of the others.") (cleaned up); *see also Royce v. Michael R. Needle P.C.*, 950 F.3d 939, 951 (7th Cir. 2020) ("In Illinois (as in all states), a court gives contract terms their common and generally accepted meaning, as informed by the context of the contract as a whole.") (cleaned up). The Court will not construe the arbitration language through a keyhole. "The intent of the parties is not to be gathered from detached portions of a contract or from any clause or provision standing by itself." *Gallagher v. Lenart*, 226 Ill. 2d 208, 233, 314 Ill. Dec. 133, 874 N.E.2d 43 (2007).

Varma agreed to arbitrate claims about his "employment," but his "employment" ended when he left the company. That's the upshot of the provision about departures: "Employee's employment under this Agreement may be terminated by the Employee or the Company at any time for any reason whatsoever, or for no reason." *See* Employment Agreement, at ¶ 4 (Dckt. No. 11-1). When he left the company, his "employment" ended, too. And Varma only agreed to arbitrate claims about his "employment," meaning the period of time between joining and leaving the company in September 2017.

The term "employment" did not mean "employment at any time in his life." It did not mean employment writ large. Instead, "employment" referred to the period of time between when he became an employee and left the company.

10

The end of Varma's "employment" triggered the end of the agreement. The Employment Agreement defined the "**Term**" of the contract as follows: "This Agreement shall remain in full force and effect throughout the duration of Employee's employment with the Company, and for a period of twelve (12) months after the termination or expiration of Employee's employment with the Company (the '<u>Restrictive Period</u>')." *See* Employment Agreement, at ¶ 2 (Dckt. No. 11-1) (bold and underline in original). The effective "term" of the Employment Agreement ended with the "termination or expiration of Employee's employment with" TCC, plus the 12-month Restrictive Period. *Id.*

At the same time, the agreement said nothing about what would happen if Varma were terminated, but later re-hired. The "**Term**" provision does not address that scenario, and the "**Termination of Employment**" provision doesn't, either. *Id.* (bold in original). There is no "Re-hire" provision. And there are no provisions defining "employment" more broadly – *e.g.*, as any time that Varma happened to be working for TCC, whether or not he quit and was rehired.

The Court must construe the word "employment" consistently across the entire agreement. *See Gallagher*, 226 Ill. 2d at 233. And the agreement envisioned Varma's employment as a single-shot affair, with a beginning and end. Varma's employment under the Employment Agreement lasted from May 2016 until September 2017, when he left to work for Target. There is no provision in the Employment Agreement that suggests that it snapped back to life when TCC rehired Varma in October 2017. Indeed, the contract language suggests that TCC and Varma needed to ink a new employment deal with a new "term" of employment.

Unlike the arbitration provision, some provisions did remain in place after Varma's employment ended. In particular, Varma agreed to restrictive covenants, and they remained in effect for one year after he left the company. The "**Term**" provision states that the Agreement

11

remained in place during Varma's employment, and "for a period of twelve (12) months after the termination or expiration of Employee's employment with the Company (the 'Restrictive Period')." *See* Employment Agreement, at ¶ 2 (Dckt. No. 11-1) (underline in original).

The parties don't address that language, but it appears that the 12-month extension for the "Restrictive Period" applied to the restrictive covenants, and the restrictive covenants only. The phrase itself is telling. It later appears – four times – in the paragraph about "**Restrictive Covenants**," and it appears nowhere else in the Agreement. *Id.* at ¶ 7 (bold in original). The textual clues suggest that the 12-month extension applied to the restrictive covenants, only. There is no comparable language extending the reach of the arbitration provision. Maybe TCC could have constructed an argument that the 12-month Restrictive Period applied to everything – including arbitration. But TCC advanced no such argument, and thus it is waived. *See G & S Holdings LLC v. Cont'l Cas. Co.*, 697 F.3d 534, 538 (7th Cir. 2012).

So Varma had a duty to arbitrate any disputes about his employment during the employment period. But once he left the company, any disputes about future conduct were not governed by the past agreement. The reach of the arbitration agreement ended when the employment ended. It did not reach disputes about post-departure conduct.

Despite arguing that it considered Varma to be "continuously" employed throughout 2017, TCC does not dispute that his employment ended – if only briefly – in September 2017. TCC admits that Varma "left his employment with TCC in late September 2017." *See* Defs.' Reply, at 1 (Dckt. No. 17). So, TCC admits that Varma's employment at TCC ended in September 2017. It began again in October 2017. There were two employment relationships, and the Employment Agreement covered only the first one.

12

The Seventh Circuit has held that an expired agreement to arbitrate does not compel arbitration of claims arising from later business dealings – even if the parties continued to do business on the same terms as under the expired agreement. *See Nissan N. Am., Inc. v. Jim M'Lady Oldsmobile, Inc.*, 486 F.3d 989, 994–95 (7th Cir. 2007); *see also Roberts Irrigation Co., Inc. v. Hortau Corp.*, 2016 WL 3440623, at *3–4 (W.D. Wis. 2016); *LWR Time, Ltd. v. Fortis Watches, Ltd.*, 2012 WL 2905187, at *7 (M.D. Pa. 2012); *O'Hare Accommodations, Inc. v. Aaron Corp.*, 2010 WL 2106650, at *2–4 (N.D. Ill. 2010); *Frank v. 84 Components Co.*, 2002 WL 1364168, at *2–3 (S.D. Ind. 2002). True, the arbitration agreement in *Nissan* had an express termination date – as in, an actual date on the calendar when the contract would cease to govern. Here, the Employment Agreement did not say it expired on a specific date.

But the Employment Agreement did define the relevant Term. It says that it would "remain in full force and effect" for the "duration of Employee's employment," which could be "terminated" at any time by either Varma or TCC. *See* Employment Agreement, at ¶ 2 (Dckt. No. 11-1). And the arbitration provision covered claims arising from Varma's "employment," whose termination triggered the end of the Employment Agreement. *Id.* at ¶¶ 2, 12. So, the Employment Agreement did envision a clear end date for Varma's employment, even if it was to be determined by the parties' actions. According to its plain terms, the parties' arbitration agreement covered the "duration of [Varma's] employment" from May 2016 to September 2017, and not afterwards.

To resist this conclusion, Defendants point to *Hoenig v. Karl Knauz Motors, Inc.*, 983 F. Supp. 2d 952 (N.D. Ill. 2013). The District Court in *Hoenig* held that an arbitration agreement from a prior employment period required arbitration of claims arising from the employee's second employment period, even absent a new arbitration agreement. *Id.* at 962–64. But the

13

arbitration provision in *Hoenig* covered a broader scope than the one here: "any claim, dispute, and/or controversy . . . arising from, related to, or having any relationship or connection whatsoever with Employee seeking employment with, employment by, or other association with the Dealership." *Id.* at 962. The language in *Hoenig* – covering "any relationship or connection" with "employment" "whatsoever" – could reasonably be read to include re-hire by the employer. That is, the employee in *Hoenig* agreed that he would arbitrate any claims involving his employment with the company, ever.

Here, the arbitration clause applies only to Varma's "employment" with TCC under the Employment Agreement. And as discussed above, "employment" under the agreement does not mean anytime Varma happened to work for TCC. *See* Employment Agreement, at ¶ 12 (Dckt. No. 11-1). "[E]mployment" means the specific period from when Varma was hired in May 2016 until he left the company in September 2017 – which sets the "Term" of the Employment Agreement.

Judge Hamilton reached the same conclusion in *Frank v. 84 Components Co.*, 2002 WL 1364168 (S.D. Ind. 2002) (Hamilton, J.). In *Frank*, the court addressed the same question: "The contested issue here is whether the arbitration agreement from 1999 can be applied to claims arising under the second firing when there was no separate arbitration agreement for Frank's second period of employment." *Id.* at *2. The answer rested on basic contract interpretation. *Id.* The court found that the employer failed to show objective evidence of an agreement to arbitrate claims the second time around: "84 Lumber has not come forward with any evidence of words or actions that Frank should have interpreted as meaning that she was agreeing to arbitration when 84 Lumber hired her for the second time." *Id.* at *3. "Parties who once agreed to arbitrate all of their future disputes can later agree not to do so." *Id.* at *2.

14

So it is here. A second employment relationship is not governed by the first employment agreement unless the agreement says so. Here, the Employment Agreement did not govern the relationship between TCC and Varma after they parted ways in October 2017. The contract does not say that Varma must arbitrate any claims about his employment, now and forever. Instead, the reach of the arbitration provision ended when the employment ended. Varma agreed to arbitrate disputes about his employment during that period, and no more.

### B. The 2017 Offer Letter

Defendants seek to revive the Employment Agreement by arguing that the 2017 Offer Letter "expressly incorporated the terms and conditions contained in the Employment Agreement." *See* Defs.' Reply, at 5 (Dckt. No. 17). The 2017 Offer Letter said that the offer was "contingent upon your signing all necessary new hire paperwork and agreements." *See* 2017 Offer Letter, at 1 (Dckt. No. 14, at 10 of 11). Defendants do not spell it out, but the argument seems to be that the signed Employment Agreement qualified as a "new hire paperwork" or "agreement[]" under the 2017 Offer Letter. *Id.* So, as Defendants see it, Varma did not need to sign a new employment agreement. By signing the 2017 Offer Letter, he revived the old Employment Agreement.

That argument fails to deliver. For starters, the Offer Letter does not "expressly incorporate[] the terms and conditions contained in the Employment Agreement." *See* Defs.' Reply, at 5 (Dckt. No. 17). Nothing in the Offer Letter brings the Employment Agreement back to life.

At best, Varma simply agreed to sign "all necessary new hire paperwork and agreements." *See* 2017 Offer Letter, at 1 (Dckt. No. 14, at 10 of 11). But an agreement to sign an agreement is not the same thing as actually signing an agreement. There is no indication that he *actually* signed any paperwork or agreement requiring arbitration when he rejoined the

15

company. Maybe TCC had the right to require Varma to sign an employment agreement. But based on the record, it never exercised that right. Varma cannot be bound by an employment agreement that he never signed.

Maybe it was TCC's policy not to require re-hired employees to sign new employment agreements. And maybe TCC assumed that Varma's old employment agreement still governed his re-hire. Maybe that's how TCC did things. After all, there is no evidence that Varma signed any other new hire paperwork, like new W-4 or I-9 forms. *See* Pl.'s Resp., at 4 (Dckt. No. 14); Varma Declaration, at ¶ 5 (Dckt. No. 14, at 9 of 11). So maybe TCC assumed that everything in Varma's old personnel file applied to his re-hiring.

But an unstated assumption is not good enough to compel arbitration. TCC must supply evidence of an agreement to arbitrate. *See Tinder v. Pinkerton Sec.*, 305 F.3d 728, 735 (7th Cir. 2002). And the evidence must include a valid written agreement to arbitrate Varma's claims relating to the second employment period. *See* 9 U.S.C. §§ 3, 4; *Gupta v. Morgan Stanley Smith Barney, LLC*, 934 F.3d 705, 710 (7th Cir. 2019). The 2017 Offer Letter simply does not revive the expired Employment Agreement.

If anything, the Offer Letter undermines TCC's argument. The reference to "signing all necessary new hire paperwork and agreements" suggests that the old agreement was no longer in place. *See* 2017 Offer Letter, at 1 (Dckt. No. 14, at 10 of 11). Also, the Offer Letter expressly contemplated the filing of lawsuits, with no mention of arbitration: "**In partial consideration for my employment with TCC Wireless, LLC, I understand and agree that I must file any claim or suit concerning my employment or termination of employment within 182 days after I knew or should have known of the occurrence of the event precipitating the claim or**

16

suit." *Id.* at 2 (bold in original). The Offer Letter recognized Varma's right to bring a "**claim or suit**," and did not limit where he could bring it. *Id.*

Did it matter that Varma was not a "new hire" but was instead a "re-hire"? The 2017 Offer Letter doesn't make any distinction between "new" hires and re-hires. It doesn't say "signing all necessary new hire paperwork and agreements, unless such paperwork is already on file from a previous employment with TCC." It just says that Varma must sign "new hire paperwork and agreements."

The plain language of the Employment Agreement and the 2017 Offer Letter determine whether the parties agreed to arbitrate Varma's second-employment-period claims. "'[T]he language of a contract alone, . . . given its plain and ordinary meaning, is the best indication of the parties' intent.'" *See Stampley v. Altom Transp., Inc.*, 958 F.3d 580, 586 (7th Cir. 2020) (quoting *Gallagher v. Lenart*, 226 Ill. 2d 208, 232–33, 314 Ill. Dec. 133, 874 N.E.2d 43 (2007)).

The Court cannot consider language that the parties could have, but did not, include in their written agreements. If TCC considered Varma "continuously employed" despite his termination and subsequent re-hire, the 2017 Offer Letter should have (and could have) said so. The Court must construe the 2017 Offer Letter (and the 2016 Employment Agreement) as they are, not as TCC wishes them to be. *See Lewitton v. ITA Software, Inc.*, 585 F.3d 377, 381 (7th Cir. 2009) ("Having agreed to be bound by the contract as written, it is particularly unavailing for ITA to attempt to cloud the contract's interpretation with post-hoc explanations of its state of mind at the time the contract was inked.").

    C.    **The Federal Policy Favoring Arbitration**

Federal law favors arbitration, and "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *See Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25 (1983); *see also Brickstructures, Inc. v. Coaster Dynamix, Inc.*, 952

17

F.3d 887, 891 (7th Cir. 2020). But arbitration is a creature of contract, and courts "cannot require a party to submit a dispute to arbitration unless he has agreed to do so." *See Gupta v. Morgan Stanley Smith Barney, LLC*, 934 F.3d 705, 710 (7th Cir. 2019); *see also Matterhorn, Inc. v. NCR Corp.*, 763 F.2d 866, 871 (7th Cir. 1985) (holding that the "Universal Agreement" between the parties "may have been universal" in scope, "but it was not eternal"; the parties later replaced the agreement, likewise displacing its arbitration provision).

The Court's task is to "implement the *parties'* preferences between judicial and arbitral forums, not to displace that choice with one of [its] own." *Stone v. Doerge*, 328 F.3d 343, 346 (7th Cir. 2003) (emphasis in original). TCC bargained for an Employment Agreement with Varma, and it governed his initial employment with the company. Once that relationship ended, the Employment Agreement ended too, except for the restrictive covenants not relevant here. This Court will not rewrite the contract to give TCC arbitration rights that it did not bargain for. *See Lippert Tile Co. v. Int'l Union of Bricklayers & Allied Craftsmen, Dist. Council of Wisconsin & Its Local 5*, 724 F.3d 939, 949 (7th Cir. 2013) ("It is not for the courts to rewrite contracts."); *see also Walker v. Trailer Transit, Inc.*, 824 F.3d 688, 690 (7th Cir. 2016) ("The judiciary does not rewrite contracts after the fact to favor one side."); *Davis v. G.N. Mortg. Corp.*, 396 F.3d 869, 881 (7th Cir. 2005) ("[C]ourts are not in the business of rewriting contracts to appease a disgruntled party unhappy with the bargain it struck.").

TCC has not come forward with any objective evidence that the parties agreed to arbitrate all employment disputes, now and forever, even if the employee left the company and later returned. Without evidence of an agreement to arbitrate, this Court will not compel arbitration.

## Conclusion

Defendants' Motion to Compel Arbitration and Dismiss for Lack of Jurisdiction or to Stay Proceedings is hereby denied.

Date: August 12, 2020

Steven C. Seeger
United States District Judge